IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

CHRISTINA CUNNINGHAM,      )
     )
     Plaintiff,      )
     )
v.      )      No. 3:12-CV-254
     )
TENNESSEE CANCER SPECIALISTS,      )
PLLC,      )
     )
     Defendant.      )

**<u>MEMORANDUM OPINION</u>**

This civil action is before the court for consideration of "Defendant Tennessee

Cancer Specialists, PLLC's Motion for Summary Judgment" [doc. 18]. Plaintiff has filed

a response in opposition [docs. 23, 24], and defendant has submitted a reply [doc. 30]. Oral

argument is unnecessary, and the motion is ripe for the court's determination.

Plaintiff has filed suit for alleged violation of the Tennessee Human Rights Act

("THRA"), Tennessee Code Annotated § 4-21-101, *et. seq*.; the Tennessee Disability Act

("TDA"), Tenn. Code Ann. § 4-21-101, *et seq*.; the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 1211, *et. seq*.; the Pregnancy Discrimination Act ("PDA"), 42 U.S.C.

§ 2000e (k); and state common law claims for intentional infliction of emotional distress and

outrageous conduct.[1] For the reasons that follow, defendant's motion will be granted, and

this case will be dismissed.

---

[1] Outrageous conduct and intentional infliction of emotional distress are the same cause of
action. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997).

# I.

## *Background*

Tennessee Cancer Specialists, PLLC ("TCS") provides comprehensive treatment and care to cancer patients in East Tennessee and surrounding states. TCS is organized into two teams comprised of physicians, physician assistants, nurses and staff. Team 2 serves patients in Knoxville, the Dowell Springs location, as well as the Morristown, Harrogate, and Newport offices. Plaintiff went to work for TCS at the Dowell Springs location on October 10, 2011, in the position of scheduler. Shannon Arwood and plaintiff were the only two full-time schedulers at the Dowell Springs location at that time. Plaintiff was responsible for doing the scheduling for Dr. Brenda Nicholson, Dr. Richard Lee, and Dr. Raymond Brigg, while Arwood did the scheduling for three other oncologists.

Schedulers have a multitude of responsibilities including referring patients; handling calls and contacting patients, insurance carriers, and hospitals; scheduling patients' tests and hospice care; receiving physician orders and sending orders for scheduled tests; and obtaining insurance precertifications ("precerts"). Obtaining precerts for patient external referrals is an important responsibility of the scheduler's job. If precerts are not timely obtained and forwarded to the third-party provider, the patient can experience delays and the need to reschedule the external referral, all of which can delay the patient's return appointment at TCS.

The scheduler position is complex and detail intensive and is considered critical to patient care. Arwood had responsibility for training plaintiff, and for the first two weeks plaintiff sat with Arwood at her desk learning the multiple facets of the job. After that initial period, plaintiff sat at her own desk located next to Arwood. Training for the scheduler position normally takes about 90 days, but it can take as long as six months to be fully proficient in the job. For the first several weeks of plaintiff's training, she only did scheduling for patients at the Dowell Springs office. After these initial weeks, plaintiff assumed responsibility for scheduling all patients for the physicians on her team, no matter the location.

A scheduler needs to be punctual and reliable in attendance, since TCS has limited administrative staff able to handle the scheduling responsibilities on short notice and such staff members have their own job responsibilities. Valerie Gibbs, the Team 2 Operations Manager, states in her declaration that when she interviewed plaintiff she stressed the importance of the scheduler being present regularly and on time. She also told plaintiff that the office is fast paced and the work performed is time and safety sensitive. Plaintiff recalls that they discussed that the office is fast paced.

In early December 2011, plaintiff learned that she was pregnant. On December 2, 2011, plaintiff spoke with Ronda Oellien, the Human Resources Manager at the time about her pregnancy.[2] Plaintiff inquired whether she had to tell anyone or when she had to tell

[2] Oellien is no longer employed by TCS. She left her employment with TCS on December
(continued...)

3

Gibbs, her operations manager about her pregnancy. Oellien told plaintiff that "it was her information to give, it wasn't anybody else's information, and if she wanted to wait until the pregnancy was viable, then that was up to her." Plaintiff testified that she recalls Oellien telling her that most people wait until they are three months along in their pregnancy before giving notice, which for plaintiff would have been after her ninety-day probationary period.

On December 14, 2011, an incident involving the Morristown Diagnostic Center occurred. A precert for one of plaintiff's physicians had not been done for a scan. Plaintiff testified that when she received the call that the precert had not been done, she referred it back to the Morristown office. Plaintiff received a call from Gibbs telling her that she needed to handle the matter. Although plaintiff testified that she misunderstood about the person Gibbs told her to follow up with, the precert was taken care of with the patient and diagnostic center being notified. Plaintiff testified that based upon what Arwood had told her about scheduling done prior to the switch to a new system, she did not think she was responsible for the precert for the Morristown office.

Gibbs states in her declaration that on December 14, 2011, she received a call from Jennifer Brader in the Morristown office complaining that plaintiff had been asked to work on an urgent precert for a patient waiting at the Morristown Diagnostic Center. Rather than handling the precert herself, plaintiff referred the center to the Morristown office. Gibbs states that by December 14, plaintiff knew or should have known that she had responsibility

---

[2](...continued)
31, 2011, to take another position.

4

for obtaining all precerts for her physicians, no matter what office was involved. According to Gibbs, she called plaintiff and told her to contact Brader to get the information necessary for the precert and admonished plaintiff that she was expected to handle all precerts for her physicians. When Gibbs arrived at the Morristown office, she learned that plaintiff had not called Brader. Gibbs called plaintiff who said she did not know who Brader was but said the precert had been handled.

The following day, December 15, plaintiff was in the lunch room complaining about Gibbs hurting her feelings because Gibbs insinuated that plaintiff was trying to push work off onto other people. Gibbs states in her declaration that a co-worker informed her that plaintiff had been complaining about her in the lunch room and also that plaintiff was pregnant. Gibbs also states that she had heard comments from plaintiff's co-workers that plaintiff was complaining a lot and this was disruptive and also that she had heard a rumor that plaintiff was pregnant.

Further, Gibbs states that after receiving this information, she contacted Dr. Nicholson about counseling plaintiff concerning the precert incident with the Morristown office and the rumor regarding plaintiff's being pregnant. In her declaration, Dr. Nicholson states that she thought they needed to know if plaintiff was pregnant so they could plan for the hiring and training of someone to cover plaintiff's position while she was on leave. The scheduler position could not be left unfilled for an extended maternity leave and the position cannot be filled by a temporary employee. So, Dr. Nicholson agreed that Gibbs should ask

5

plaintiff if she was in fact pregnant.

Plaintiff testified that Gibbs called her into her office and reprimanded her for her conduct the day before and for complaining about Gibbs to a co-worker. Gibbs then asked when plaintiff was going to tell her she was pregnant. Plaintiff made hand-written notes of what she says occurred in the meeting. They reflect that when the incident from December 14 was discussed, plaintiff explained that she was doing what the person who trained her had said to do. Gibbs told plaintiff that in the future she would be responsible for all scheduling and she was not to refer it back to someone else. Plaintiff said that she was fine with this but taken aback by Gibb's demeaning tone. Gibbs continued to belittle her bringing up "issues" other co-workers had with her and called plaintiff a "Debbie downer." Then according to plaintiff, Gibbs took a "very affronted body language pose" and asked why plaintiff had not told her she was pregnant. Plaintiff notes that Gibbs did not give her a chance to answer and asked about when plaintiff was going to tell her and how far along she was. Plaintiff told Gibbs that she was advised by HR [Oellien] to wait until after the first doctor's appointment to be sure the pregnancy was viable and that she would not miscarry, which would be after plaintiff's 90 day probationary period. Plaintiffs notes reflect that Gibbs said plaintiff's pregnancy issue had caused her a problem and that she would be interviewing for someone to fill the full-time position, and plaintiff would be moved to a floater position. Also according to plaintiff's notes, Gibbs told her Oellien had informed her incorrectly about procedure. Gibbs also said plaintiff would be considered for future

6

scheduling positions when she was more reliable for the company.

In her declaration, Gibbs states that she met with plaintiff on the afternoon of December 15 to counsel her about the importance of her job responsibilities and advise her that complaining about Gibbs to other TCS employees was inappropriate. Gibbs did ask plaintiff when she was going to tell her about the pregnancy, and plaintiff told her she had not been to a doctor yet. Gibbs states that she disagreed with Oellien's advice about waiting to tell about the pregnancy because of the critical nature of plaintiff's job. Gibbs informed plaintiff that she would be hiring someone for the full-time scheduling position and cross train plaintiff as a floater, but she would consider plaintiff in the future for a scheduling position if one became available. Gibbs prepared a counseling memorandum concerning the meeting and asked plaintiff to return the original with her signature. The last paragraph of the memorandum states:

> I told her that when I hired her I explained that we had difficulty with covering the schedule and that I needed someone dependable. I told her that I would be hiring someone for the full time scheduling position and that we would use her as a floater. I told her that she may be considered in the future for a scheduling position if one came available.

After the meeting with Gibbs, plaintiff called Oellien and left a voice mail message, saying she was very upset about the situation and asked "if this was normal practice."

Plaintiff testified that Oellien returned the call that evening and said she had spoken with Scott Hitch, the Chief Executive Officer of TCS, and "that that is not normal

7

practice" and that Oellien and Hitch would meet with her. Oellien testified that plaintiff called her on her cell phone about 7:00 p.m. the evening of the meeting with Gibbs. During the conversation plaintiff was "completely flustered, frustrated, [and] mad" according to Oellien and she had been crying. Plaintiff relayed to Oellien what had occurred in the meeting with Gibbs. When the call ended, Oellien immediately called Hitch.

In her conversation with Hitch, Oellien expressed her concern that she had not been part of the reprimand since she was supposed to participate in such actions. She also expressed her concern about Gibbs's "badgering [plaintiff] regarding her pregnancy" and the comments made about plaintiff's pregnancy. According to Oellien, Hitch said "I can't believe that" and promised to look into the matter further.

Hitch stated in his declaration that he knew Oellien and Gibbs did not get along, but he agreed with Oellien that plaintiff's complaint needed to be addressed. On December 16, 2011, Hitch contacted Dr. Nicholson and informed her about plaintiff's complaint and Gibbs's reaction to plaintiff's pregnancy. He also contacted TCS's attorney.

Later the same day, Hitch, Dr. Nicholson, and Gibbs met with TCS's legal counsel. The decision was made that plaintiff would remain in her position. When TCS management received plaintiff's due date, TCS would hire a new employee who would be trained and have experience to cover for plaintiff while she was on maternity leave. Plaintiff would be returned to her scheduling position upon her return from maternity leave. It was further decided that Dr. Nicholson and Gibbs would meet with plaintiff so that Dr. Nicholson

8

could correct some of Gibbs's statements. Dr. Nicholson would also inform plaintiff that TCS supports its pregnant employees, confirm that plaintiff would be given maternity leave, and assure plaintiff that she would not be removed from her scheduling position.

Plaintiff testified that on December 16, 2011, Gibbs approached her and told her she needed to return the original memorandum Gibbs had given her the day before. Plaintiff told Gibbs that she had been advised not to sign it or not to give it back to her, one of the two, although she could not remember which. Plaintiff stated that Gibbs told her she had done nothing wrong, and plaintiff told her she did not want to talk about it because it upset her. Plaintiff further testified that Gibbs was talking to her in the hallway where patients were present and she was embarrassed because Gibbs was "borderline yelling at me." When asked in her deposition, plaintiff denied that she walked out of Gibbs's office because she did not want to speak to Gibbs.

On December 19, 2011, plaintiff called Oellien to tell her that she was having a panic attack because of the way Gibbs was treating her. Oellien put plaintiff on hold while she spoke with Hitch who agreed that if plaintiff was feeling that way she should go home and to have Oellien let Gibbs know. Oellien testified that she emailed Gibbs and told her about plaintiff's leaving. Gibbs responded that in the future an employee needed to be referred to her and she would handle such matters.

On December 21, 2011, plaintiff met with Dr. Nicholson and Gibbs, and the meeting was followed up with a memorandum, which was given to plaintiff. Dr. Nicholson

9

took contemporaneous notes of the meeting. Plaintiff and Gibbs agree that the memorandum accurately reflects what was discussed at the meeting. Dr. Nicholson and Gibbs explained to plaintiff the critical nature of her scheduling position and that having the position filled at all times is imperative. They told plaintiff that to ensure coverage of her position, they would begin to cross-train her and a new hire so there would be adequate coverage while she was out on maternity leave. Dr. Nicholson and Gibbs emphasized that TCS does not discriminate against its pregnant employees, and told plaintiff she would receive her full maternity leave. They stated further that TCS has always supported its pregnant employees and that TCS would be supportive of plaintiff as well. Dr. Nicholson and Gibbs also told plaintiff that their concern was not that she was going to be out sick during her pregnancy but that they could not have her job unfilled for up to three months, and the position cannot be filled with a temporary employee.

Also at the December 21 meeting, Dr. Nicholson and Gibbs addressed the issues that had arisen recently between plaintiff and Gibbs and a recent incident when plaintiff had been late to work. They reminded plaintiff that her direct report was Gibbs, a fact which was not a change but a clarification of the proper chain of command. They also provided plaintiff with Gibbs's phone number.

Gibbs sent plaintiff an email on January 3, 2012, regarding scheduling errors and three precerts that plaintiff had not completed for tests that had been scheduled. Plaintiff admitted in her deposition that she mistakenly scheduled a bone scan instead of a bone

10

density test that had been ordered by Dr. Nicholson. As a result, the patient received a charge for a procedure that was not ordered. Plaintiff also admitted that she scheduled a CT of the cervical spine when Dr. Nicholson had ordered a CT of the sacral spine. On January 6, 2012, Gibbs received an email from Dr. Nicholson's nurse, April McGlothin, regarding hospice care that had been ordered by Dr. Lee, one of plaintiff's assigned physicians, that had not been placed by plaintiff. In the email, McGlothin and Dr. Lee requested that all scheduling for the Harrogate office be returned to that office.

On January 12, 2012, Gibbs and Dr. Nicholson met with plaintiff concerning the numerous errors that had as of that date impacted the care of at least ten patients. The meeting was memorialized in a memorandum. Plaintiff admits that other than the three precerts referenced in memorandum and the January 3 memorandum, the information included is correct. Also at the meeting, Dr. Nicholson and Gibbs told plaintiff that they were implementing a new 90-day probationary period because it was clear she needed additional training. They offered to give plaintiff support and assistance but encouraged her to seek help from her coworkers when she had questions.

Plaintiff states that she admits to making some mistakes. She testified that she was in a catch-22 because her coworkers were giving her the cold shoulder and not helping her and when she sought help from the doctors or nurse practitioner, she was reprimanded by Gibbs. Plaintiff also stated that she was not fully trained in some areas such as scheduling patients for hospice care.

11

The day following the January 12 counseling meeting with Dr. Nicholson and Gibbs, Friday, January 13, 2012, plaintiff did not timely obtain two precerts for scans she had scheduled for the following Monday. Arwood stayed late and sent an email at 7:15 p.m. to Gibbs informing her of the situation and expressing her frustration with the circumstances. Only one precert could be obtained, so the scan for the other patient had to be rescheduled. Plaintiff testified that she started the precerts and that Amy was going to finish them because plaintiff had to leave early. Plaintiff said she was confused about the scans and also that the system was down. Plaintiff conceded that it was technically her fault that her coworkers had to stay late on Friday night to resolve the problem. On Monday, January 16, 2012, Gibbs met with plaintiff and Arwood concerning Arwood's email and what had occurred the Friday before. Arwood told plaintiff that she should not have scheduled appointments on Friday for the following Monday with the existing difficulties in obtaining precerts. Plaintiff admits this was a valid point. Gibbs also explained to plaintiff that Amy was not her backup; Arwood was her backup.

On January 18, 2012, Dr. Nicholson emailed Gibbs regarding problems that Knoxville Breast Center ("KCBC") was having with plaintiff. KCBC is a major source of referrals to TCS. The complaints included that KCBC staff were treated with "rudeness and discourtesy" by plaintiff and that plaintiff told a KCBC staff member that she did not have time to do a precert for an MRI being performed the next day. Another incident involved a doctor adjusting his schedule to see a patient. However, the patient was a no show because

in spite of making multiple calls to TCS for appointment information, she never heard from TCS about the date and time of the appointment. In her email, Dr. Nicholson expressed concern about not continuing to offend KCBC because of the importance of their business to TCS. She then requested that plaintiff no longer do any scheduling for KCBC.

TCS has an attendance policy that requires an employee to notify his or her supervisor or manager by 7:00 a.m. each day of absence due to illness, unless an authorized medical leave has been obtained. TCS also has a job abandonment policy which states in part, "Employees who fail to report or call in for three consecutive schedule shifts will be considered to have voluntarily resigned and to have abandoned their position." Plaintiff was fully aware of both of these policies.

The last day plaintiff worked at TCS was January 18, 2012. Plaintiff represented in an interrogatory answer that she notified Gibbs by phone on January 19, 20, 23, 26, 30, and February 1 of her absences due to illness. Plaintiff testified in her deposition that she believed she used her cell phone to make the calls and that she called Gibbs's cell phone number or her work number. She believes she called the office number on February 1 but called the cell phone number for all the other dates.

Gibbs states in her declaration that on January 19 she received a call from plaintiff's fiancé stating that plaintiff was sick and was going to the doctor. He made reference to a urinary tract infection. Gibbs further states in her declaration that on the evening of January 19 she received a call from plaintiff who said that her doctor said she

could return to work on January 23 and that she would bring a note from the doctor. Plaintiff testified that she first saw her doctor on January 23. Plaintiff also testified that she called Gibbs on January 19 and 20, telling her she was sick.

Plaintiff further testified that on January 23 she let Gibbs know that she had been to the doctor. She believes she texted and called Gibbs after her doctor's appointment to tell her that she would be out through the 25th. Plaintiff testified that she asked Gibbs if she wanted her to send her a work excuse, but Gibbs said they would take care of it when she returned. Plaintiff actually saw her doctor on January 23. Gibbs states in her declaration that after plaintiff did not come to work on January 19, she made a list of all calls she received from plaintiff. Gibbs states that plaintiff called on January 23 saying that her doctor wanted to see her that morning and she would return to work after the appointment. According to Gibbs, she did not hear from plaintiff again on January 23, and plaintiff did not return to work that day.

Gibbs's declaration and call list indicate that she did not hear from plaintiff on January 24 or 25. Plaintiff testified that she did not return to her doctor nor did her doctor extend her return to work date beyond January 25. Plaintiff called Gibbs on January 26, although at her deposition she could not recall what was said. Per Gibbs, plaintiff left a voicemail message saying that she would be back in office on Monday, January 30 and she would bring a doctor's note to cover the illness. With regard to the January 26 contact with Gibbs, plaintiff could not recall what was said in the conversation and could not remember

14

whether she left a voicemail message.

In anticipation of plaintiff returning to work on January 30, Gibbs conferred with Dr. Nicholson who although having reservations about plaintiff being successful at the scheduler position, told Gibbs to allow plaintiff to return to work with specific conditions.

Plaintiff testified that she called Gibbs on her cell phone on January 30 to tell her she and her daughter were both sick and she was taking her daughter to the doctor. Plaintiff also testified that she called Gibbs on her cell phone or the TCS office number on February 1 to report that her daughter was still sick. Plaintiff recalled that in the February 1 call she told Gibbs that her daughter was sick with an ear and sinus infection.

In her deposition, plaintiff acknowledged that if she made the calls to Gibbs on January 30 and February 1, they would be noted on her cell phone records. Gibbs cell phone records indicate that she received calls from plaintiff on January 19, 23, and 26. Plaintiff's cell phone records reflect that she called Gibbs's cell phone on January 19, 23, and 26. When plaintiff was questioned in her deposition concerning what the phone records indicated and whether she might be mistaken about calling Gibbs on January 30 and February 1, plaintiff stated, "I might have called the [TCS] main number." Hitch stated in his declaration, which included as an exhibit the phone records for the Dowell Springs main line number, that there are no calls from plaintiff's cell phone to the TCS number from January 19 through February 4. The following question and answer occurred at plaintiff's deposition:

15

> Q. Okay. Well, if there is no record in any cell phone or TCS's phone of a phone call from your number on January the 30th or February 1, would you agree that you must have made a mistake and that you didn't call those days.?
>
> A. Then yes.

When asked if she "misremembered" calling on January 30 or February 1, plaintiff said she might have used her fiancé's phone. Hitch stated in his declaration that there were no calls to the Dowell Springs main line number from plaintiff's fiancé's phone from January 19 through February 4.

According to Dr. Nicholson and Gibbs, because plaintiff had not reported to work or contacted TCS for four consecutive days, they determined that plaintiff had voluntarily quit her employment. In a letter dated February 2, 2012, Gibbs notified plaintiff that TCS was interpreting her lack of notification regarding her absences and failure to report to work as a voluntary termination. The letter stated in pertinent part:

> You have not reported to work or notified us of the reason for your absence on January 30 and 31, and February 1 and 2.
>
> This letter serves as notice that Tennessee Cancer Specialists is interpreting your lack of notification regarding your absences, as well as your failure to report to work as a voluntary termination.

Plaintiff testified that when she got the letter, she notified her attorney. She did not, however, make any effort to contact Dr. Nicholson, Gibbs or any other person at TCS to say

16

she was not quitting or leaving her job.

## II.

### *Standard of Review*

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir. 1992)

(citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

## III.

### *Analysis*

### PDA and THRA Pregnancy Discrimination Claims[3]

Title VII as amended by the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related

---

[3] Courts have held that the THRA is designed to execute the policies of federal discrimination laws and to act as an extension of those laws. Thus, when courts have evaluated THRA claims, they have applied the same standards as those applied by federal courts in addressing cases brought pursuant to Title VII. *Raines v. Shoney's, Inc.,* 909 F.Supp. 1070 (E.D. Tenn. 1995); *Stalsworth v. Dixie Cement Co.,* No. 1390, 1991 WL 51401 (Tenn. Ct. App. April 11, 1991). This application includes the Pregnancy Discrimination Act of 1978. *Payne v. Goodman Mfg. Co.*, 726 F. Supp. 2d 891, 903 (E.D. Tenn. 2010); *see also Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp. 1315, 1326-27 (M.D. Tenn. 1996)). It is "well settled that a claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII." *Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996); *see also Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n.1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims.") (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Therefore, the court's analysis of plaintiff's PDA claim applies equally to her THRA pregnancy discrimination claim.

18

purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). A plaintiff can demonstrate a prima facie case of pregnancy discrimination in one of three ways: direct evidence, statistical proof, or the *McDonnell-Douglas* burden shifting analysis. *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996).[4] "Direct evidence of discrimination is evidence that proves that discrimination has occurred without requiring further inferences." *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 640 (6th Cir. 2006) (citations omitted). However, employing the direct method still requires the showing of an adverse employment action. *Raciti-Hur v. Homan*, No. 98-1218, 1999WL 331650, at *3 (6th Cir. May 13, 1999) ("If the plaintiff succeeds in establishing a prima facie case in one of these three ways, then the burden shifts to the defendants to present a legitimate nondiscriminatory reason for the adverse employment action.").

In order to establish a prima facie case under the PDA using the burden shifting analysis, a plaintiff must show:

> (1) that she was a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the given position; and (4) that she was replaced by an individual who is not a member of the protected class. Alternatively to this fourth element, a plaintiff may show that a comparable non-protected person was treated better.

*Id*. (internal quotation marks and citations omitted).[5] "In relation specifically to a pregnancy

---

[4] The statistical method is not applicable in this case and will not be referenced further.

[5] Some courts articulate the fourth prong as requiring a showing that "there is a nexus between [plaintiff's] pregnancy and the adverse employment decision." *Williams v. Steven D. Bell*
(continued...)

discrimination claim, the 'relevant respects' in which comparables must be similarly situated are their 'ability or inability to work.'" *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 574 (6th Cir. 2006) (quoting *Ensley-Gaines*, 100 F.3d at 1226). If plaintiff makes this prima facie showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Raciti-Hur*, 1999 WL 331650, at *3. If the defendant satisfies this burden of production, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id*. Throughout this process, the ultimate burden of persuasion remains with the plaintiff. *Id*.

Defendant argues that whether plaintiff employs the direct or indirect burden shifting method, her pregnancy discrimination claims fail because she cannot demonstrate that she was subjected to an adverse employment action. The court agrees.

The Sixth Circuit defines an adverse employment action as "a materially adverse change in the terms of [a person's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)).

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse

---

[5](...continued)
*& Co.*, No. 3:06-0359, 2007 WL 1296026, at *5 (M.D. Tenn. May 1, 2007). The showing for the fourth prong can be demonstrated the same way. "It is incumbent upon Plaintiff to present evidence from which a jury could conclude that comparable employees in all relevant respects were treated more favorably which would give rise to an inference that pregnancy was the reason for less favorable treatment." *Id*. (internal quotation marks omitted).

> change might be indicated by a termination of employment, a
> demotion evidenced by a decrease in wage or salary, a less
> distinguished title, a material loss of benefits, significantly
> diminished material responsibilities, or other indices that might
> be unique to a particular situation.

*Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). "In other words, there must

be a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits." *Miceli v. U. S. Dep't of Transp.*, 83 F. App'x 697, 700 (6th Cir. 2003)

(internal quotation marks and citation omitted). "Employment actions that are *de minimis*

are not materially adverse and are not actionable under Title VII." *Wills v. Pennyrile Rural

Elec. Co-op. Corp.*, 259 F. App'x 780, 783 (6th Cir. 2008) (citing *Bowman v. Shawnee State

Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)).

Plaintiff contends that she was "reprimanded and demoted" by Gibbs on

December 15, 2011. Defendant argues that the record demonstrates that plaintiff was not

demoted nor reassigned from her scheduler position. Defendant also argues that whether

Gibbs counseled or reprimanded plaintiff on December 15, it does not rise to the level of an

adverse employment action.

While Gibbs's comments on December 15 indicated that plaintiff would be

transferred to a floater position, that action was never taken. Plaintiff argues that she was

demoted in that meeting. However, after Gibbs, Hitch, and Dr. Nicholson met with counsel

on December 16, 2011, the decision was made not to reassign plaintiff. That information

was relayed to plaintiff in the December 21 meeting. The Sixth Circuit has "decided that when an employer imposes an employment action that would be an adverse employment action but then quickly reverses the action, the employee has not suffered an adverse employment action." *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263 (6th Cir. 2005) (citing *Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151 (6th Cir. 2004); *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000)); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) (and cases cited therein) ("The caselaw in this area indicates that the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action.").

Plaintiff admits that while she was employed at TCS she did not receive any pay reduction, her hours were not reduced, and she was not assigned to a different location that would have caused her difficulty. Plaintiff remained at her desk and continued to perform the scheduler job. When asked in her deposition whether her job changed after December 15, plaintiff answered, "I still continued to schedule for the doctors." She agreed that she performed that work all day, every day. In short, the terms of plaintiff's employment did not change as a result of the December 15 meeting. *Miceli*, 83 F. App'x at 700.

With regard to plaintiff's contention that she was reprimanded in the December 15 meeting, the memorandum memorializing the meeting states that Gibbs was "counseling Christina on the importance of understanding her role and that it was very inappropriate to sit and complain about this [precert issue with Morristown office on December 14] in front

22

of other staff members and the physicians that were in the breakroom." This action does not rise to the level of an adverse employment action. *Fricke v. E.I. DuPont Co.*, No. Civ.A.3:02CV536-S, 2005 WL 1949552, at *3 (W.D. Ky. Aug. 11, 2005) (placement on renewal plan, increased duties while on renewal plan, removal from facilities on specific date, and failure to notify plaintiff of rights under Family Medical Leave Act "did not constitute an adverse employment action because [they] did not materially change the terms of [plaintiff's] employment") (quoting *Miceli*, 83 F. App'x at 700); *Creggett v. Jefferson Cnty. Bd. of Ed.*, 491 F. App'x 561 (6th Cir. 2012) (written reprimand, denial of professional-training opportunities, forced resignation from a committee, failure to receive promotion, and harassment with excessive classroom observations not more than *de minimis* employment actions, at best). Gibbs's conversation with plaintiff regarding plaintiff's complaints in the breakroom, be it counseling or a reprimand, does not rise to the level of an adverse employment action.

Plaintiff also argues that she suffered an adverse employment action when Gibbs "began what can only be described as a campaign of unjustified criticisms and reprimands" once Gibbs learned of plaintiff's pregnancy. In support of her contention, plaintiff references her meetings on December 21 and January 12 with Dr. Nicholson and Gibbs and the January 3 email from Gibbs. Defendant argues that plaintiff's testimony and the record do not support this contention.

Plaintiff testified that with regard to the memorandum memorializing the December 21 meeting, the only fact which she found to be inaccurate was the reference to her refusing to talk with Gibbs. Plaintiff stated that she did not refuse to speak with Gibbs; she just did not want to talk to her about the issue. She found no inaccuracies regarding what Dr. Nicholson told her regarding her being given maternity leave, the concern for having her position filled while she was on leave, and the fact that they had changed their mind about a reassignment and that she would remain in her scheduler position. Plaintiff admittedly understood in her deposition that at the December 21 meeting, Dr. Nicholson and Gibbs intended to leave her in her scheduler position and cross train someone to cover her job while she was out on maternity leave. Further, plaintiff testified that the meeting was not threatening or negative regarding her pregnancy. The following exchange occurred in plaintiff's deposition:

> Q. Okay. Did you find anything about this meeting to be threatening or negative insofar as it discussed your pregnancy?
>
> A. No.
> . . .
> Q. . . . My question is are you taking the position that this meeting in which was conducted by Dr. Nicholson and Valerie that we've talked about extensively, that there was something said or done in there that discriminated against you because of your pregnancy?
>
> A. No.

24

Plaintiff argues that the statements made by TCS in the December 21 meeting were unbelievable. Plaintiff testified as follows:

> Q.  Did you have any reason to doubt Dr. Nicholson when she told you that TCS was supportive of their pregnant employees and that they'd had several have maternity leaves and return?
>
> A.  Yes. Yes. I mean, Valerie, how many days before just said that me being pregnant was an issue that they were going to replace me. So yes, I doubted what she was saying.
>
> Q.  So you doubted Dr. Nicholson?
>
> A.  I mean, I doubted what they both said.
>
> Q.  So you think that Dr. Nicholson was not being up front, honorable, or truthful when she told you that you would have your maternity leave and that they value their pregnant employees and that the pregnant employees always got their maternity leave?
>
> A.  Not that Dr. Nicholson did, no. I believe what she said, yes.
>
> Q.  Well, Dr. Nicholson supervises Valerie Gibbs, doesn't she?
>
> A.  Yes.

Thus, plaintiff ultimately stated that she believed what Dr. Nicholson told her in the December 21 meeting which corrected the statements made by Gibbs in the December 15 meeting. Elsewhere in her deposition, plaintiff stated that she found Dr. Nicholson to be straightforward, truthful, and honorable. Dr. Nicholson is the supervisor over Gibbs and a

25

decision maker, so she was certainly in a position to authoritatively correct Gibbs's statements of December 15. Even if plaintiff continued to maintain that she thought the representations in the December 21 meeting were unbelievable, her opinions and beliefs are not sufficient to overcome defendant's showing. Plaintiff's perception is not evidence. *Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 871 (1st Cir. 1997), *abrogated in part on other grounds by Crowley v. L.L. bean, Inc.,* 303 F.3d 387 (1st Cir. 2002). TCS did not remove plaintiff from her scheduler position for the remainder of her employment, just as Dr. Nicholson said would be the case. Plaintiff did not remain long enough in TCS's employ to go on maternity leave. Other than her perceptions, plaintiff has offered nothing to demonstrate that TCS had no intention of following through with the corrected position it announced at the December 21 meeting. In addition, as has already been noted, plaintiff testified that there was nothing negative, threatening or discriminatory as to her pregnancy at the December 21 meeting.

Plaintiff also contends that she was reprimanded in the December 21 meeting. The memorandum from that meeting states:

> In light of three situations described below that have occurred since our discussion on December 15th, we feel it necessary to remind you that your direct report is Valerie Gibbs, Operations Manager. This is not a change in your direct report but rather a clarification of our expectations on proper chain of command.

Following this paragraph, is a reference to December 16 when plaintiff informed Gibbs she did not want to talk to her and left her office, December 19 when plaintiff left the office

26

because she felt like she was having a panic attack and did not notify Gibbs, and December 20 when plaintiff was late and did not notify Gibbs. Plaintiff takes issue with each of these events. She contends she did not want to talk to Gibbs about the pregnancy issue, not that she did not want to speak to her at all. Plaintiff also points out that on December 19 she had permission to leave from Hitch and Oellien and on December 20 she was following the procedures others follow about coming in late.

While plaintiff takes exception to the three incidents noted, there is nothing inappropriate in light of those events to remind plaintiff that Gibbs was her direct contact. The memorandum makes clear that should plaintiff have to leave the office, take time off, or be late, she needed to report to Gibbs, her supervisor. Plaintiff's contention that she was told she could not bypass Gibbs and could not go to human resources or anyone else is not reflected in the memorandum. Plaintiff was reminded that her position requires regular and timely attendance and if she needed to be out of the office, she was to report to Gibbs. Oellien's opinion regarding the propriety of plaintiff reporting only to Gibbs is irrelevant since she was not plaintiff's supervisor nor was she a decision maker regarding the issues involving plaintiff. In any event, the "reprimand" does not rise to the level of an adverse employment action.

The January 3 email notified plaintiff of two scheduling errors, which plaintiff admittedly made. She scheduled the wrong test for one patient and ordered the wrong area of the spine for a CT scan. The email also references three precerts that were missed. At a

meeting on January 12, 2012, Gibbs and Dr. Nicholson discussed these errors and others with plaintiff. The memorandum for the January 12 meeting referenced the multiple errors plaintiff had committed. She testified that with the exception of the three precerts, which she says she had taken care of before she left the office, there was nothing incorrect in the memorandum. Plaintiff also testified that in the January 12 meeting there was nothing done that was discriminatory against her because of her pregnancy.

The January 3 email and January 12 meeting do not rise to the level of an adverse employment action. *Creggett*, 491 F. App'x at 565. Further, plaintiff has not shown that she suffered a materially adverse change in the terms of her employment. As noted above, plaintiff admitted that she did not experience a pay reduction, she continued to perform scheduling for her doctors, and she was not relocated. While she complains about the meetings along with Gibbs's demeanor and coming to her daily with negative comments, plaintiff admits that there was nothing inappropriate with Gibbs trying to correct errors, wrong scans being ordered, and precerts not getting done.

Accordingly, plaintiff has not shown an adverse employment action based upon the December 15, December 21, January 12 meetings or the January 3 email. Plaintiff does, however, claim that she was terminated, which constitutes an adverse employment action. Defendant argues that plaintiff did not call in for four consecutive days in violation of TCS's attendance policy, and therefore TCS concluded that plaintiff had voluntarily terminated her employment with TCS.

28

On January 26, 2012, plaintiff represented that she would return to work on January 30. Plaintiff, however, did not report to work on that date, nor on January 31, February 1 and 2. Initially plaintiff stated in interrogatory answers and deposition testimony that she called Gibbs on those days using her cell phone. Yet when presented with documentary evidence in the form of phone records that do not show she called as she claimed, she admitted she must have mistaken about calling. While plaintiff offered that she might have used her fiancé's phone, the phone records again do not support her claim. The phone records do not sustain plaintiff's contention that she called Gibbs's cell phone or the main Dowell Springs number using her own or her fiancé's phone on the days she did not report for work, January 30 and 31 and February 1 and 2. Gibbs's notes regarding plaintiff's absences reflect that the last contact with plaintiff was on January 26 when she represented that she would return to work on January 30 with a doctor's note. Plaintiff's testimony and interrogatory answers representing that she called in those days is contradicted by the record, and the court does not have to adopt her version for summary judgment purposes. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). After viewing all of the relevant phone records, no reasonable juror could believe that plaintiff called to report her absences on the days in question using either her or her fiancé's phone by calling either Gibbs's cell phone or the main number at the

Dowel Springs office.

Plaintiff knew what the attendance policy required regarding calling her supervisor on each day of her absence, and she also was aware of the job abandonment policy. Plaintiff was also well aware of the critical nature of her job and the importance of having her position covered each day. This fact had been made clear to her again in recent counseling with Gibbs and Dr. Nicholson, who reinforced how she needed to report to Gibbs when it was necessary that she be out of the office or late to work. TCS was justified in concluding that plaintiff had voluntarily ended her employment with TCS. In addition, when plaintiff received the letter stating TCS's position regarding the status of her employment, plaintiff made no effort at all to contact anyone at TCS to say that she was not abandoning or quitting her job. Thus, plaintiff was not involuntarily terminated, and she cannot show an adverse employment action based on such a termination.

Because she cannot show an adverse employment action, plaintiff's prima facie case under the PDA fails. Nevertheless, defendant argues that even if plaintiff could show an adverse employment action, she cannot meet the last prong of the prima facie case, that she was replaced by an individual who is not a member of the protected class or alternatively, that a comparable non-protected person was treated better. Plaintiff has not made such a showing. Defendant has offered proof showing that the job abandonment policy has been applied uniformly to employees who failed to report in or call for three consecutive days. Two employees between June 2011 and July 2012 failed to call in and were considered to

30

have voluntary quit their positions with TCS. On this basis as well plaintiff has failed to demonstrate a prima facie case under the PDA.

However, as noted above, some cases identify the fourth factor in a prima facie case of pregnancy discrimination as the showing of a nexus between the pregnancy and the adverse employment decision. *Megivern v. Glazier Hills Inc*., No. 12-1330, 2013 WL 2097373 (6th Cir. May 16, 2013). Temporal proximity between the announcement of the pregnancy and the adverse employment decision can be sufficient to show a nexus. In *Megivern*, the plaintiff was terminated two months after announcing her pregnancy and the district court had found Megivern had stated a prima facie case. The Sixth Circuit concluded that the district court had not erred. In this case, plaintiff announced her pregnancy in early December and left TCS's employ on February 2, 2012. Using this prima facie framework, plaintiff has arguably shown the fourth prong of her prima facie case.

Nevertheless, plaintiff's prima facie case still fails because she cannot demonstrate that she experienced an adverse employment action. She did not suffer any material adverse change in the terms of her employment. Plaintiff remained in her scheduler position, she did not experience any reduction in pay or benefits, and she remained at her same office and desk location. None of the counseling or reprimands rise to the level of an adverse employment action based upon the standards established in Sixth Circuit authority. Further, plaintiff admitted that the meetings on December 21 and January 12 as well as the January 3 email were not negative, threatening or discriminatory regarding her pregnancy.

31

In addition, plaintiff admits she made errors and that it was appropriate for Gibbs to address those errors, particularly in light of the critical nature of the scheduler position and the need to timely provide care to TCS's cancer patients. Furthermore, plaintiff cannot show that she was terminated. The documentary record containing the relevant cell phone and phone records simply does not substantiate plaintiff's representations that she called in on the days in question. TCS had legitimate reasons for concluding that plaintiff had voluntarily ended her employment with TCS. Plaintiff knew about the attendance and job abandonment policies and the importance of calling in when she could not be in the office. Plaintiff also knew the importance of having her scheduler position properly covered each day. Even after receiving the February 2 letter, plaintiff made no effort to contact anyone at TCS to say that she had not abandoned her job and did not want to quit. Because plaintiff has failed to demonstrate a prima facie case under the PDA, the court does not need to reach the issue of pretext.

Plaintiff also makes the argument that this case should be analyzed as a mixed-motive claim. In a mixed-motive claim, the *McDonnell-Douglas* burden shifting analysis does not apply. *White v. Baxter Healthcare Corp*., 533 F.3d 381 (6th Cir. 2008). To survive summary judgment in a mixed-motive Title VII claim, the plaintiff needs to "produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for the defendant's adverse employment action." *Id*. at 400 (quoting 42

U.S.C. § 2000e-2(m)).

Plaintiff fairs no better under a mixed-motive analysis since she must still demonstrate an adverse employment action. As discussed above, the court finds that plaintiff has not shown that she experienced an adverse employment action.

## Hostile Work Environment Claim

Plaintiff asserts a claim for hostile work environment based *inter alia* on her contentions that she was told by her supervisor she was no longer dependable because of her pregnancy, she suffered stress and a panic attack causing her to leave work early, and her coworkers gave her the cold shoulder and would no longer help with her assignments. Plaintiff provides no authority supporting her contention that any or all of what she experienced constitutes a hostile work environment. Defendant argues that plaintiff's claim does not meet the standard for a hostile work environment under Title VII.

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). The work atmosphere created by the harassment must be both objectively and subjectively hostile. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000). "[T]he conduct must be severe or pervasive enough to create an environment that a reasonable person would

33

find hostile or abusive and the victim must subjectively regard that environment as abusive." *Id.* (citing *Harris*, 510 U.S. at 21-22). Factors the court may consider in determining whether the complained-of conduct is severe or pervasive enough to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). While such factors may be instructive, the court must consider the totality of the circumstances in assessing whether the complained-of conduct is sufficient to constitute a hostile environment. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (citations omitted). The Sixth Circuit has stated, "Our harassment jurisprudence requires that we distinguish between harassment and discriminatory harassment." *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citing *Bowman*, 220 F.3d at 464). "Conduct that is 'merely offensive' will not suffice to support a hostile work environment action." *Id.* (citing *Harris*, 510 U.S. at 21).

To prevail on a hostile work environment claim, a plaintiff must first establish a prima facie case. *Howington v. Quality Rest. Concepts, LLC*, 298 F. App'x 436, 443 (6th Cir. 2008) (citing *Clark v. UPS*, 400 F.3d 341, 347 (6th Cir. 2005)). To demonstrate a prima facie case, the plaintiff must show that "(1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment created a hostile work environment; and that (5) the employer is vicariously

liable." *Id.* (quoting *Clark*, 400 F.3d at 347).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Harris*, 510 U.S. at 21. Plaintiff has not met this stringent standard.

The complaints raised by plaintiff regarding the continual reprimands and discipline center around the meetings to address errors that impacted patient care. With some relatively few exceptions, plaintiff admits that she made the errors that resulted in her being counseled by Gibbs and Dr. Nicholson. In her deposition, plaintiff admitted that the meetings on December 21 and January 12, as well as the January 3 email were not threatening, negative, or discriminatory regarding her pregnancy. Plaintiff also complains about Gibbs's demeanor and the way she spoke to her. This is not enough. In *Batuyong v. Gates*, 337 F. App'x 451 (6th Cir. 2009), the Sixth Circuit affirmed the grant of summary judgment on hostile work environment claim where plaintiff asserted her supervisor more than once "raised his voice, inappropriately, became verbally abusive, and chastised [plaintiff] in front of others." *Id.* at 457. The plaintiff also asserted that her supervisor refused to allow her to attend a conference and denied her travel expenses. *Id.* at 457; *see also Trepka*, 28 F. App'x at 461 (Supervisor's "contentious oral confrontation" with yelling and "stern words about [plaintiff's] ability to walk" not hostile work environment); *Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250 (6th Cir. 2008) (supervisor's derogatory

35

name calling insufficient to establish hostile work environment and name calling not sufficiently severe or threatening to interfere with plaintiff's work performance). Plaintiff has not identified nor does the documented record support conduct by Gibbs that that would constitute a hostile work environment.

Additionally, plaintiff contends that she received the "cold shoulder" from her coworkers. In her deposition when asked why her coworkers would not talk to her, plaintiff responded, "I don't know." The "cold shoulder" can contribute to the finding of a hostile work environment, but such conduct on its own is not objectively severe conduct. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 517 (6th Cir. 2009); *see also Rait v. Oshkosh Architectural Door Co.*, No. 05-C-1271, 2007 WL 702806, at *8 (E.D. Wis. Mar. 2, 2007) ("cold shoulder" treatment did not support hostile work environment claim – "Personality conflicts at work that generate antipathy and mere snubbing by co-workers and even supervisors are not actionable under Title VII") (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The fact that plaintiff says she received the "cold shoulder" from coworkers, especially since she does not know why the conduct occurred, does not show she was subjected to a hostile work environment.

Plaintiff also asserts as part of her hostile work environment claim the incident on December 19 when she felt like she was going to have a panic attack because of the demeaning way Gibbs treated her. This incident alone, although upsetting to plaintiff, is not sufficient to establish a hostile work environment. *Bowman*, 220 F.3d at 463 ("Isolated

36

incidents, however, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment.").

After considering the incidents described by plaintiff based upon the totality of the circumstances, the court finds that they are not sufficiently severe or pervasive to constitute a hostile work environment. *Bowman*, 220 F.3d at 463 ("The work environment as a whole must be considered rather than focus on individual acts of alleged hostility."). While plaintiff may have been upset by her circumstances, the conduct about which she complains was not so objectively severe to have changed the terms and conditions of her employment. With regard to a subjective component, plaintiff admitted that she made multiple mistakes and that it was appropriate to call them to her attention. She further stated in her deposition that there was nothing about the December 21 or January 12 meetings or the January 3 email that was negative, threatening or discriminatory with regard to her pregnancy. Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). There are trials and tribulations that occur in the workplace that are simply not actionable under Title VII.

## Failure to Address Claims

In her response to defendant's motion, plaintiff does not respond to defendant's arguments that summary judgment is appropriate as to her claims brought pursuant to the

37

ADA, TDA, and intentional infliction of emotional distress. Defendant argues that for this reason these claims should be dismissed. Defendant is correct.

"It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Rouse v. Caruso*, No. 06-CV-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011) (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003)); *see also Dage v. Time Warner Cable*, 395 F. Supp. 2d 668, 679 (S. D. Ohio 2005) (plaintiff abandoned claim by failing to address it in responsive briefing to defendant's motion for summary judgment); *Kattar v. Three Rivers Area Hosp. Auth.*, 52 F. Supp. 2d 789, 798 n.7 (W.D. Mich. 1999) ("The Court will treat [due process] claim as abandoned because Kattar did not address it in his brief in response to Defendants' motion for summary judgment.").

Accordingly, plaintiff's ADA, TDA, and intentional infliction of emotional distress claims are considered abandoned. Therefore, those claims will be dismissed on that basis.

IV.

*Conclusion*

Accordingly, for the reasons stated herein, defendant's motion for summary judgment will be granted, and this case will be dismissed. An order consistent with this opinion will be entered.

ENTER:

_____ s/ Leon Jordan _____
United States District Judge